THOMAS G. PLANT CO. v. MAY CO.

(Circuit Court, N. D. Ohio, E. D.    January 23, 1900.)

No. 5,996.

TRADE-MARKS—UNFAIR COMPETITION—TEMPORARY INJUNCTION.

Complainant was the manufacturer of a special line of ladies' shoes, which it designated and extensively advertised by the general name of "Queen" shoes, also stamping therein as a trade-mark a peculiar form of the words "Queen Quality." Defendant was not a manufacturer, but a dealer in shoes, and as such it purchased shoes as nearly like complain-

ant's as possible in style and quality, and caused to be stamped therein, where complainant placed its trade-mark, the word "Queen," together with its name and address. *Held* that, while the right of complainant to the exclusive use of the word "Queen" as a technical trade-mark was doubtful under the facts shown, the action of defendant clearly showed an intention to deceive purchasers, which was likely to be successful, and to profit by the reputation complainant had made for its shoes, which constituted unfair competition, and entitled complainant to a preliminary injunction.[1]

In Equity.

Crosby & Gregory, Geo. H. Maxwell, and A. C. Dustin, for complainant.

Kline, Carr, Tolles & Goff and F. H. Goff, for defendant.

RICKS, District Judge. This is a bill of complaint filed December 11, 1899, on behalf of the Thomas G. Plant Company, asking for a temporary injunction to restrain the May Company from selling a shoe sometimes designated the "Queen" shoe, and at other times designated as the "Queen Quality" shoe. The bill alleges that some years ago the Thomas G. Plant Company was organized under and pursuant to the laws of the state of Massachusetts, and for a number of years was extensively engaged in the manufacture of boots and shoes; that its said business has grown rapidly, until now, and for several years last past, its sales have reached every state of the United States, and nearly every city, large and small, therein, and throughout many foreign countries, their business being prosecuted by means of extensive advertisements and numerous agents, who solicit the retail trade throughout the United States and abroad. The bill further alleges that up to the year 1898 the complainant followed, to some extent, the usual custom of the trade in disposing of its products, but in the year 1898 it bought out the interests in a certain line of "Queen" shoes, of the Clark-Hutchinson Company, and has ever since, and including the year 1898, sold said "Queen" shoes under a new policy and system; that at the time of its organization, in 1892, the Clark-Hutchinson Company adopted the trade-mark "Queen" for one of its special lines of ladies' shoes, and it offered for sale and sold the said "Queen" shoes continuously from said adoption until the transfer of said trade-mark "Queen," and all the business connected therewith, according to a written assignment executed on the 14th day of November, 1898; that all the terms and conditions of the said assignment were duly and faithfully performed by both parties thereto, and that the said business has been carried on continuously ever since by the complainant. The bill further alleges that, as a result of the complainant's enterprise, integrity, and skill, and of the high quality and uniform excellence of the shoes manufactured and put upon the market by it, it has acquired a recognized and enviable reputation throughout the United States, and in many foreign countries, for reliability, enterprise, and honorable dealing; that, ever since and including the year 1898, the complainant has devoted its

---

[1] As to unfair competition in trade, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.

main energies to its said "Queen" shoes, and has directed all its skill of workmanship, business ability, and advertising to the improvement of said shoe, and the extending and promoting of its reputation throughout the country; that the shoe has been brought as near perfection as possible in beauty and excellence of finish, and likewise the most artistic and extensive advertising has been lavishly employed, at great expense; and, in connection with the trade-mark "Queen," the complainant has employed a representation or picture of a queen (using the famous picture of Queen Louise), and has surrounded and embellished the carrying word "Queen" of the trade-mark with an ornamental wreath, and has employed the words "Queen Quality," in connection with a capital Q having a long flourish partially embracing the said words, the whole being in script. Do the allegations of the bill entitle the complainant to claim a trade-mark which the public is bound to respect, or show such an established right to the designation "Queen," when applied to its shoes, as will entitle it to protection? The supreme court of the United States, in the case of Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151, 37 L. Ed. 1144, says:

"To acquire a right to the exclusive use of a name, device, or symbol as a trade-mark, it must appear that it was adopted for the purpose of identifying the origin or ownership of the articles to which it is attached, or that such trade-mark points distinctively to the origin, manufacture, or ownership of the article on which it is stamped, and is designed to indicate the owner or producer of the commodity, and to distinguish it from like articles manufactured by others. If a device, mark, or symbol is adopted or placed upon an article for the purpose of identifying its class, grade, style, or quality, or for any purpose other than a reference to or indication of its ownership, it cannot be sustained as a valid trade-mark."

Now, while there are allegations in the bill that the device or symbol used as a trade-mark in this case was adopted for the purpose of identifying the origin or ownership of the article to which it is attached, or points distinctively to the owner or producer of the commodity, yet we find in the averments showing the history of this trade-mark that the symbol or device used was so used for the purpose of identifying its class, grade, style, or quality.

In a note to the case of Scheuer v. Muller, 20 C. C. A. 165, which reviews all the authorities upon the principles involved in this case, it is said:

"It has been very correctly said that the principle in these cases is this: that no man has a right to sell his own goods as the goods of another. You may express the same principle in a different form, and say that no man has a right to dress himself in colors, or adopt the bare symbols to which he had no particular or exclusive right, and thereby personate another person, for the purpose of inducing the public to suppose either that he is that other person, or that he is connected with and selling the manufacture of such other person, while he is really selling his own."

The same note, in treating of unfair competition, says:

"Coming, then, to the specific rule constituting the doctrine of unfair competition in respect to the sale of vendible commodities, it may be stated as follows: Independently of the existence of any technical trade mark, no manufacturer or vendor will be permitted to so dress up his goods, by the use of names, marks, letters, labels, or wrappers, or by the adoption of any style, form, or color of packages, or by the combination of any or all of these

indicia, as to cause purchasers to be deceived into buying his goods as and for the goods of another."

In the same note the author says:

"The tendency of the courts at the present time, especially in America, seems to be to restrict the field of technical trade-marks, and to extend the field of unfair competition."

Mr. Justice Strong, speaking for the supreme court, after stating that there were some limitations upon the right to select words as trade-marks or trade-names, said:

"This will be manifest when it is considered that in all cases where rights to the exclusive use of a trade-mark are involved it is invariably held that the essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another, and that it is only when this false representation is directly or indirectly made that the party who appeals to a court of equity can have relief. This is the doctrine of all the cases."

This case is different from the ordinary case of a technical trade-mark. Ordinarily, in this class of cases, we have the public imposed upon by being sold articles which they take under the belief that they are getting what they ask for. In practicing this deception to the wrong and injury of the purchaser, the dealer is generally aided by the usual accompaniments of similarity in size or shape of the packages containing the commodity desired, of colored wrappers inclosing the same, or of imitations in printing, or of some fictitious name which sounds like the article called for, but which in fact does not correctly designate it. These goods are generally exhibited in large quantities on shelves and in show windows, where they are easily seen, and where they attract careless purchasers. But here we have an application on behalf of a dealer and manufacturer asking for the protection of this court against a rival dealer, who sells a shoe which, unless closely examined, would readily pass as being the shoe manufactured by the complainant. It is, according to the allegations of the bill, known as the "Queen" shoe, and the bill is prolific in averments that for many years, at a very large expense, the complainant and its assignor have labored to impress upon the public the fact that the "Queen" shoe was a very superior article, and worth much more than three dollars, the price demanded for it. The device or symbol which was intended to designate and identify the said shoe is described as a capital Q, with a long flourish partially embracing the words "Queen Quality." Now, as stated before, the bill refers almost exclusively to the word "Queen" as descriptive of the good will and well-established popularity of this shoe. The trade-mark does not stop with the single word "Queen," but adds "Quality," which is also circumscribed by a wreath. The really descriptive mark about the defendant's shoe, which, it is alleged, misleads the public, is the stamp at the top of the inside lining of the shoe, described in the bill. In the complainant's shoe this stamp is in gilt letters on the red silk lining on the inside of the top band of the shoe, and consists of the words "Queen Quality," as hereinbefore described. The stamp in the defendant's shoes is in much smaller letters, and much more neatly affixed to the inside lining, and consists of the words "Queen. The May Co., Cleveland, Ohio." I have some doubts as to whether the

complainant has so fully protected its trade-mark, and has so strictly adhered to what it has chosen to make and call that trade-mark, as to entitle it to protection by injunction for the trade-mark alone; but we may look to the trade-mark as aiding us in determining the exact legal status of the parties to this suit. If the defendant company were manufacturers of a shoe so nearly like the "Queen" shoe, with its similar stamp, as to make it easy to deceive or mislead the public, an injunction would cause them serious interruption in their business, and be a great loss to their reputation. The facts disclose that they do not occupy any such position. They buy goods wherever they choose, sell them on the market for whatever price they choose, and advertise them, by name and description, to catch the floating trade. If they were manufacturers, they would then occupy a position which would entitle them to claim the sympathy of the court, because it seriously interfered with their business. But the facts disclosed in this application are that the defendant, finding the complainant's shoe so thoroughly and widely advertised, and a reputation established that was making the shoes sell rapidly, looked about for some shoe that would enable the defendant to be a rival of the complainant, both in the quality and style of the shoe to be sold. I have no sympathy with a party that seeks to poach upon his rival's trade by deliberately making or selling an article so nearly like the complainant's that the ordinary purchaser would be readily deceived. It is shown that the complainant has spent large sums of money in advertising its "Queen" shoe. That money is capital invested in its business, and it has a right to be protected, so as to reap the fruits of the enterprise and judgment demonstrated in building up its trade. The defendant bought a small quantity of the original "Queen" shoes, and, learning that the complainant was about to establish an agency here, offered these original "Queen" shoes to its trade, so as to forestall the action of the complainant. Now, it can easily be argued that, disregarding the quality and finish of the complainant's shoes, there is little evidence here to support a bill for a trade-mark or a bill for unfair competition. So far as the trade-mark is concerned, it would be very easy for the ordinary purchaser of shoes to be deceived. The trade-mark of the complainant's shoe is not conspicuously shown on the outside, where it can be seen on the shelf or in the show window, but it is carefully and neatly placed on a red band around the top of the inside of the shoe, where it can only be seen by examination. Exhibiting the shoe in a show window, as is ordinarily done, the trade-mark would hardly be seen; but examining it, as the purchasers of shoes usually do, the purchaser might be deceived by the similarity of the two trade-marks. The unfair competition is clearly shown by the studied efforts of the defendant to secure a shoe so nearly like the complainant's that it can be palmed off on the public as the complainant's shoe. There is some proof that this has actually been done. There is proof, also, that the defendant stands ready, if the injunction is refused here, to put upon the market its "Queen" shoes at a low price, in order to secure the fruits of the trade. I am aware that the authorities suggest that an injunction ought not to be allowed in these cases unless it is evident that the complainant's trade-

mark is being infringed, and its trade seriously affected. I think in this case no great harm can come to the defendant by allowing a temporary injunction. It would not stop any manufacturing, because the defendant has no factory. It might compel it to hold a large stock for a short time, until this litigation can be disposed of. That would probably be harmful, but we must not look too far into the question of probable damages, or we will have to deny the complainant's rights, to which it is clearly entitled. The application for a temporary injunction, as prayed for in the bill, will therefore be allowed.